WARD, ADMINISTRATRIX, v. NORTH CAROLINA RAILROAD COMPANY.

(Filed 4 December, 1912.)

1. Nonsuit—Negligence—Evidence—Questions for Jury—Proximate Cause.

Upon a motion to nonsuit, the evidence of the plaintiff must be taken as true and construed in the light most favorable to him; and in an action to recover damages against a railroad company for the negligent killing of plaintiff's intestate, there was evidence tending to show that the intestate, with five others, were engaged in loading imposing stones on defendant's box car, from a wagon, each 6 or 7 feet long, 3½ feet wide, 4 inches thick, and weighing about 1,000 pounds each; that one of these stones had been placed in the car, several inches projecting from the door, and to further load this, four of the men were in the car, leaving the intestate and the driver of the wagon holding to the other stone, placed upright upon the wagon to keep it from breaking, until the stone on the car could be put in place; that while in this dangerous position, without help to brace the stone or hold the horses, it being all the intestate and driver could do to hold the stone upright, the engineer of the defendant, in shifting cars, carried the one in question off without warning with the four men in it, with full knowledge of the intestate's danger, keeping it for fifteen minutes, and when the car returned, the jarring of the ground caused by the moving train or the movement of the horses, caused the upright stone to be thrown on the intestate, causing his death: *Held,* the issue as to defendant's negligence was for the jury, and the doctrine of proximate cause, in *Harton v. Telephone Co.,* 141 N. C., 455, and other like cases, cited and approved.

2. Negligence—Proximate Cause—Definition.

The proximate cause of the event must be understood to be that which in natural and continuous sequence, unbroken by any new and independent cause, produces that event, and without which such event would not have occurred. Proximity in point of time or space, however, is not part of the definition.

3. Negligence—Proximate Cause—Anticipated Result—Evidence.

In order to show that the proximate cause of an injury was the negligent act complained of, it is not required that the party charged should have contemplated or even been able to anticipate the particular consequence that ensued, or the precise injuries sustained. It is sufficient if in the exercise of reasonable care he might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected.

4. Instructions — Correlative Positions — Evidence — Appeal and Error.

*Held*, under the evidence in this case, there is no error in the manner of stating the position of the plaintiff, and the correlative position tending to sustain the defense.

5. Negligence—Evidence—Mortuary Tables—Measure of Damages—Instructions.

In an action to recover for the negligent killing of another, the life expectancy tables are allowed as an item of evidence on the issue of damages, under the rule laid down in *Mendenhall v. R. R.*, 123 N. C., 275, to ascertain their admeasurement, by finding the present value of the net pecuniary worth of the deceased, ascertained by deducting the cost of his own living and expenditures from the gross income, based upon his life expectancy; the rule laid down in *Watson v. R. R.*, 133 N. C., 190, is not approved.

APPEAL by defendant from *Cooke, J.*, at June Term, 1912, of GUILFORD.

Civil action. The action was instituted by plaintiff, administratrix of James Ward, deceased, to recover damages for the alleged negligent killing of her intestate in the city of High Point on 22 October, 1909, while loading a printing outfit into one of the cars on the team track of the defendant company. On the ordinary issues in such action, as to negligence, contributory negligence, and damages, there was verdict for plaintiff. Judgment on the verdict, and defendant excepted and appealed.

WARD *v.* R. R.

*W. P. Bynum and R. C. Strudwick for plaintiff.*
*Wilson & Ferguson for defendant.*

HOKE, J. It was chiefly urged for error that the court refused defendant's motion for nonsuit under the statute.

There was evidence on the part of the plaintiff tending to show that on 22 October, 1909, plaintiff's intestate and five others, including the driver of the team, were engaged in loading a printing outfit into a car of defendant company placed upon the "team track" near the freight station in the city of High Point, and for that purpose the wagon had been backed up against the car, that particular load consisting of two large "imposing stones," stone slabs 6 to 7 feet long, 3½ feet wide and 4 inches thick and weighing by estimate of the driver about 1,000 pounds each. That the stones, each in a separate crate standing on edge in the midst of the wagon, had been braced on either side against the wagon standards as they were being hauled to the station, and when the wagon was backed against the car, these braces, preparatory to unloading, had been knocked loose and one of the stones had been transferred to the car. This stone having failed to get entirely in the car, "sticking out a few inches," in the language of the witness, four of the men were engaged in trying to push it further in, and plaintiff's intestate, James Ward, and the driver balancing the other stone in the wagon till this could be done. While things were in this condition the agents of defendant's company, without warning of any kind, hitched a shifting engine to the car and pulled this, with other cars attached to it, for some distance up the track, carrying away the four men who were working with the stone in the car, leaving the intestate and the driver holding the other stone at a balance in the wagon. The car and the men in it were kept away about fifteen minutes doing some shifting elsewhere on the yard, when they brought back the car to its original placing. When the car moved off, leaving the driver, one J. A. Cramer, and the intestate, holding the other stone in a balance, the team, at the call of the driver, moved forward a few feet with a view of preventing a possible collision in case their horses should otherwise move the wagon towards the track, and the driver and the intestate continued

to hold the stone till the return of the train, when either from the jar of the ground caused by the returning train or from a slight movement of the horses, the stone in the wagon, losing its balance, fell off the wagon onto the intestate, crushing him so that he died in about thirty minutes. The driver was also knocked from the wagon and bruised on the wrist, etc., but fell on the stone and not under it, and escaped with slight injury. Speaking directly to the killing, the driver, testifying for plaintiff, said: "The horse may have turned his head to look, and moved the wagon. It only takes very little on a macadam road to move a wagon; something moved the wagon; I am unable to say what, but something moved it, and we lost our balance and that stone, it went over against Mr. Ward; he was pushed back against the side plank of the bed and tossed out. It tripped him; in stepping back against the bed it overbalanced and tripped him out; he went out and the stone after him. The stone fell right toward Mr. Ward and the top went down and the bottom edge came up there; the plank struck me on the shins and tripped me, barked my shins a little and my wrist. Throwed me out over the stone and Ward under it. It came down there, the edge right across his breast. It mashed him; he never spoke." This witness further said the car had been placed there and they had been loading in it all day. This witness testified further that the stones broke very easily and were kept on edge to keep them from breaking in the travel by a jar of the wagon; that they could not rebrace this one after the car left, as it took all they could do to hold it on the balance; in order to brace it additional help was necessary, and they didn't think bracing would be required if the car had not been moved away. When the car was pulled away some of the men called to "Look out or somebody would be killed"; and further, that the conductor knew of the plight in which the intestate and driver had been left with the stone and was aware that the position was one not free from danger; the driver testifying among other things on this point: "We didn't ask the conductor when he came there for any assistance, only I told him we were in a pitiful way there and had the stone to hold. I spoke something in regard to the stone; I could not remember just the words.

He saw it; it was all clear to him; we had it holding it on there, and he said: 'I will have the car back in a few minutes,' and put right off up the track after the car." There was evidence on the part of defendant in contradiction of the claim of plaintiff that the officers of the road were aware of the intestate being left in a dangerous plight, and whether the train gave the proper signals for shifting, etc., in going off and returning, and the yard conductor testified that he notified Cramer, the driver, that he was about to signal the car forward; but there was no substantial difference in the testimony as to the controlling facts relevant to the inquiry; that the agents of the company, admitting they knew these persons were engaged in loading a car on the "team track," moved it away without adequate warning to the driver and without any at all to the men who were engaged in the car; that they kept it away for fifteen or twenty minutes, leaving the intestate and the driver all that time engaged in holding a heavy stone on end in a way which was liable at any time to fall and hurt them; and the testimony on the part of plaintiff tended to show that the company's agents were duly aware of their plight, and in such case and in view of the position so frequently stated, that on motion to nonsuit, the evidence of plaintiff must be taken as true and construed in the light most favorable to him, we are of opinion that the motion for nonsuit was properly overruled and a cause of action clearly shown. It was earnestly contended in support of the motion that the element of proximate cause was lacking in this instance, in that there was nothing to indicate to the company or its agents that fifteen minutes after taking the car away any such result as the killing of the intestate was at all probable, and that in view of the fact that the shifting was done in the usual and ordinary way, giving the usual and ordinary signals and with two men in the wagon to hold the stone steady, that this should be held only an untoward accident, and that no actionable wrong had been shown. But we cannot accept this view of the facts in evidence. In *Harton v. Telephone Co.,* 141 N. C., 455, a case in which the question of proximate cause, more especially in reference to lapse of time and the effect of intervening causes, was very

fully discussed, the Court stated with approval the definition appearing in Shearman and Redfield on Negligence, sec. 26, as follows: "The proximate cause of an event must be understood to be that which in natural and continuous sequence, unbroken by any new and independent cause, produces that event and without which such event would not have occurred. Proximity in point of time and space, however, is no part of the definition." As said by *Associate Justice Allen* in *Harvell v. Lumber Co.*, 154 N. C., 262, while two of the justices dissented in *Harton's case* (their views finally prevailing on a second appeal and a fuller statement of the facts in the same case, 146 N. C., 429), there was no difference of opinion as to the doctrine announced, but only to the application of it to that case. And this same definition of proximate cause has been again approved in *Hardy v. Hines Lumber Co.*, 160 N. C., 113. In further illustration of this definition, and more particularly the terms, "natural and continuous sequence," in *Brewster v. Elizabeth City*, 137 N. C., 392, and *Ramsbottom v. R. R.*, 138 N. C., 39, and other cases, this Court has said, "That the proximate cause of an injury is one that produces the result in continuous sequence and without which it would not occur, and one from which any man of ordinary prudence could foresee that such result was probable under all of the facts as they existed." And pursuing the subject, it has been held in *Drum v. Miller*, 135 N. C., 204, and *Hudson v. R. R.*, 142 N. C., 198, and other like cases, that in reference to foreseeing the result, it is not required that the party charged "should have contemplated or even been able to anticipate the particular consequences that ensued or the precise injuries sustained. It is sufficient if in the exercise of reasonable care he might have foreseen that *some* injury would result from his act or omission or that consequences of a generally injurious nature might have been expected." Applying these principles to the facts in evidence, we think that the element of proximate cause was clearly established, and certainly there was testimony from which it could be reasonably inferred. The car being moved away without adequate warning, carrying four of the men considered necessary for the proper handling of the load, leaving the driver and

the intestate with a stone of this shape and weight on end, requiring all their time and attention to hold it on a balance and with no one to aid them or even control the team, presented a condition that was fraught with danger, and the yard conductor, on seeing it, might well exclaim, "I will have the car back in a few minutes," and put right off up the track after the car. Nor is this conclusion in any way affected by the fact referred to, that the injury occurred as much as fifteen or twenty minutes after the car was pulled away, or that there were only two men in the wagon when it was so moved. The cause of this tragedy was taking away the other men, leaving the intestate and the driver in the wagon in a position threatening danger, without adequate help. This cause continued down to the very time of the occurrence. There was no intervening cause shown, and as we have just seen in *Harton's case,* "Proximity in point of time and space is no part of the definition of proximate cause."

As to the position that there were only two men in the wagon at the time the cars were moved off, it will readily occur to the impartial mind that leaving two men in a wagon with a heavy stone of this character and the team without any one to control it for fifteen or twenty minutes is an entirely different proposition from allowing them to balance a stone momentarily with four other men in instant call should necessity arise for their aid.

The objection further made, that the court, after stating the position of the plaintiff, failed to state with sufficient fullness the correlative position tending to sustain the defense as required in *Jarrett v. Trunk Co.,* 144 N. C., 299, and *Penny v. R. R.,* 153 N. C., 305, is not, in our opinion, open to defendant on the record.

There were very few facts in evidence tending to excuse the defendant for this occurrence, and these were given by his Honor all the consideration which they permitted.

On the issue as to damages objection was made by defendant for that his Honor suggested for the guidance of the jury the mathematical calculation stated with approval in *Watson v. R. R.,* 133 N. C., 190, and in terms as follows: "You will ascer-

tain the present value of such net income or accumulations by first ascertaining what $1 and interest at 6 per cent will amount to for the time you have found the plaintiff's intestate would have lived. Then you will divide this income by the amount you have found $1 and interest for the time to amount to, and the sum thus ascertained will be your answer to the second issue."

If this were a matter capable of being established with mathematical accuracy, the rule as here suggested would be erroneous, for it proceeds upon the theory that all the net earnings will become due at the end of the expectancy, when in fact the total amount is made up of smaller sums accruing year by year. A proper consideration of the question presented, however, supports the conclusion that there are so many elements of uncertainty involved, the result is or may be affected by so many changes of condition and circumstance that it does not seem to be capable of computation with mathematical precision, and a reference to such a method is rather calculated to mislead than to aid the jury to a correct conclusion. It is for this reason that the Court in *Poe v. R. R.,* 141 N. C., 525, rejected the application of our annuity tables on the issue as to damages, and *Associate Justice Walker,* delivering the opinion, said: "A review of all that has been said on this subject leads us to the conclusion that no special formula has yet been prescribed as alike applicable to all cases and as one that should invariably be used in trials."

He then states with approval on this question the charge as delivered by his Honor, *Judge O. H. Allen,* in *Mendenhall v. R. R.,* 123 N. C., 275 and 278, as being a correct statement of the rule more generally applicable in these cases: "The measure of damages is the present value of the net pecuniary worth of the deceased, to be ascertained by deducting the cost of his own living and expenditures from the gross income, based upon his life expectancy. As a basis on which to enable the jury to make their estimate, it is competent to show and for them to consider the age of the deceased, his prospects in life, his habits, his character, his industry and skill, the means he had for making money, the business in which he was employed—the

end of it all being to enable the jury to fix upon the net income which might be reasonably expected if death had not ensued, and thus arrive at the pecuniary worth of the deceased to his family. You do not undertake to give the equivalent of human life. You allow nothing for suffering. You do not attempt to punish the railroad, but you seek to give a fair, reasonable pecuniary worth of the deceased to his family under the rule which I have laid down. You should rid yourself of all prejudice, if you have any, and of sympathy. It is not a question of sympathy; it is just a plain practical question, and you should give a reasonable and fair verdict upon all the issues." The life expectancy tables were allowed as an item of evidence on this issue. *Sledge v. R. R.,* 140 N. C., 459.

The objection referred to is not insisted on in defendant's brief, and the mistake in the charge being in his favor, it may not be held for reversible error, but it has been thought well to refer to the matter that this mathematical calculation as approved in *Watson v. R. R.,* 133 N. C., 190, should be discontinued.

There is no error, and the judgment in plaintiff's favor must be affirmed.

No error.